## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

*Electronically Filed*

| | | |
|---|---|---|
| **JAMEE WELLMAN** | ) | |
| **1571 GREENLANKE DR** | ) | |
| **XENIA, OH 45385** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | **CASE NO. _____** |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GREENE COUNTY** | ) | |
| **PUBLIC HEALTH** | ) | **COMPLAINT** |
| **360 WILSON DR** | ) | **WITH JURY DEMAND** |
| **XENIA, OH 45385** | ) | |
| **Serve:** | ) | |
| **ZASHIN & RICH** | ) | |
| **c/o DREW PIERSALL** | ) | |
| **17 SOUTH HIGH ST. # 900** | ) | |
| **COLUMBUS, OH 43215** | ) | |
| | ) | |
| **DEFENDANT** | ) | |

## COMPLAINT

For her complaint against the Defendant Greene County Public Health (GCPH), Plaintiff

Jamee Wellman alleges and avers as follows:

1.     Throughout the COVID-19 pandemic Jamee Wellman stood ready, willing, and

able to take safety precautions in the workplace as required by her past employer to prevent the

spread of Covid-19 and protect her health and the health of those employees with whom she

worked. The Plaintiff, however, has a religious belief that conflicts with one of her past

employer's safety policies: mandatory vaccination. The Plaintiff's conflict is protected by

federal and state law. Thus, this case is not a challenge to the lawfulness of the policy imposed

1

by the Defendant, but rather its application and an attempt to prevent unlawful discrimination based on religion in the future and to hold her past employer accountable for the harm she has suffered at its hands.

2.     Federal and state law recognize an employee has a right to have religious beliefs considered when those beliefs conflict with an employer's policies, and, when possible, accommodated. The Defendant ignored federal and state law and instead applied its own set of rules when it comes to religious accommodations and exemptions to its mandatory Covid-19 vaccination policy. Defendant then wrongfully denied Plaintiff's request by claiming without objective support that granting Ms. Wellman's exemption request would be a "direct threat" to others at her workplace. This was done in violation of Defendant's obligations under Title VII of the Civil Rights Act of 1964 ("Title VII") and Section 4112.02 of the Ohio Revised Code ("O.R.C. § 4112.02").

3.     Defendant's actions left Ms. Wellman's with the impossible choice of either taking the Covid-19 vaccine, at the expense of her religious beliefs, or losing her livelihood.

4.     Under Title VII and Ohio law, if an employee seeks a religious accommodation, their employers cannot summarily impose employer-preferred workplace rules that abridge an employee's sincerely held religious beliefs without genuine, good-faith dialogue and consideration of proposed accommodations with objective evidence, and, if the employer chooses to deny an employee accommodations, proof that allowing the accommodations would place an *undue burden,* on the employer. GCPH's behavior was in violation of these laws.

### PARTIES

5.     The Plaintiff, Jamee Wellman, ("Plaintiff" or "Ms. Wellman") is a resident of Xenia, Ohio. The Plaintiff had been employed by the Defendant for over 4 years. The Plaintiff

2

has a sincere religious belief that taking a Covid-19 vaccine violates her religious beliefs. The Plaintiff requested a religious accommodation from the Defendant's vaccine mandate policy updated on October 7, 2021 ("vaccine mandate") (attached here to as **Exhibit A**)

6.      The Defendant is incorporated in the State of Ohio, with its principal place of business at 360 Wilson Dr. Xenia, OH 45385. Actual direction, control and coordination of the Defendant's business occurs in Xenia, Ohio.

## JURISDICTION AND VENUE

7.   This Court has jurisdiction over the parties pursuant to 28 U.S.C. § 1331 because the Complaint seeks relief and damages under federal statute, 42 U.S.C. § 2000e, *et seq.,* and has supplemental jurisdiction over the Plaintiff's state law claim arising from the same events and occurrences under O.R.C. § 4112.02 pursuant to 42 U.S.C. § 1367.

8.   Venue is proper in this district pursuant to U.S.C. § 1391(b) because the relevant events took place in Xenia, Ohio, which is in the Southern District of Ohio, and the Defendant's principal place of business is located therein.

9.   The Court has personal jurisdiction over the Defendant because the Defendant resides and conducts business in this judicial circuit.

10.    Plaintiff's claims for attorney's fees and costs are predicated upon Title VII, 42 U.S.C. § 2000e-5, and as allowed under state law.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

11.      On or about January 21, 2022 Plaintiff timely filed charges of religious discrimination with the Ohio Civil Rights Commission (OCRC) which has a dual filing agreement with the federal Equal Employment Opportunity Commission ("EEOC").

3

12.     Her Notice of Right to Sue was issued on September 14, 2022. (Attached hereto as **Exhibit B**).

13.     This Complaint is being timely filed based on the date Plaintiff received her Notice to Right to Sue.

14.     All administrative prerequisites to the filing of this suit have been meet.

## ALLEGATIONS

15.     In March 2020, American life was irreparably changed both by Covid-19 and by various governments and employers' response to it. Covid-19 is a virus that was first detected in Wuhan, China, and eventually made its way to the United States of America, setting off a chain of events that has irretrievably changed the day-to-day life of many, if not most, Americans.

16.     In the spring of 2020, the Defendant began implementing procedures for its workforce, including several of the following requirements for its employees: masks, social distancing, temperature checks, Covid-19 testing, and self-quarantine. Upon information and belief, the Defendant had substantial success reducing the risk of COVID-19 spread through these efforts.

17.     Despite the Defendant's success in controlling the spread of Covid-19 in its workspace, the Defendant chose to implement a blanket vaccine mandate which was updated on October 7, 2021, based on reasoning unsupported by science, and has improperly implemented its vaccine mandate in violation of Title VII and O.R.C. § 4112.02.

18.     Ms. Wellman provided Defendant with a thorough explanation as to her sincerely held religious beliefs and how taking the Covid-19 vaccine violates those beliefs (attached hereto as **Exhibit C**)

19.     The Defendant improperly terminated the Plaintiff for refusing to comply with one of its safety procedures – mandated vaccination – which has limited results in preventing the transmission of disease in the workplace, ignores natural immunity, and improperly assesses risk.

20.     Defendant informed Ms. Wellman that they denied her request via a letter dated October 18, 2021. The document stated: "failure to receive the vaccine would pose a direct threat to the health and safety of you or others that cannot be eliminated or reduced by reasonable accommodation.  With regard Covid-19, a "direct threat" includes a determination that an unvaccinated employee will expose others to the virus at the workplace."  (Attached hereto as **Exhibit D**)

21.     The "direct threat" analysis is required when an employee is requesting an accommodation under the Americans with Disabilities Act (ADA), not Title VII as is the case here.

22.     The test the employer must consider is whether the accommodation would pose an undue hardship. As flushed out below, had the Defendant applied this test properly, the Defendant's termination of Ms. Wellman would remain illegal.

**The Defendant pivoted from successful and proven Covid-19 mitigation practices and improperly chose mandated vaccination as its sole safety procedure upon which it predicated employment.**

A.   The vaccine mandate is unlawful as enforced.

23.     The Food and Drug Administration ("FDA") issued an Emergency Use

Authorization ("EUA") for the Pfizer-BioNTech vaccine on December 1, 2020 for select populations. One week later a second EUA for the Moderna Covid-19 vaccine was issued. The FDA issued an EUA for the Johnson & Johnson Covid-19 vaccine on February 27, 2021. On August 23, 2021, the FDA issued full approval for the Pfizer-BioNTech COVID-19 vaccine marketed as Comirnaty. However, it should be noted, that the FDA has admitted the Comirnaty vaccine, which is legally distinct from the Pfizer vaccine that is currently available in the US, has never been available in the US.

24.     Though the FDA has approved the use of a currently unavailable vaccine for future use, the only vaccines widely available for use in the United States are these three experimental, investigative and unlicensed drugs, all of which were either developed, tested, or produced with the use of fetal cells from aborted fetuses.

25.     Since the rollout of the vaccines, more and more data increasingly show the vaccines do not prevent infection, do not prevent transmission, and do not prevent illness. Indeed, countries with the most aggressive, expansive use of the vaccines have seen record-setting infection rates and continuing high illness rates.

26.     Scientists studying over 4,000 frontline workers found that between December 2020 until April 2021, the effectiveness of the vaccines cratered from 91 percent to 66 percent. This drastic decline occurred before the Delta and Omicron variants became dominant variants.[1]

---

[1] Ashely Fowlkes, et al., *Effectiveness of COVID-19 Vaccines in Preventing SARS-CoV-2 Infection Among Frontline Workers Before and During B.1.617.2 (Delta) Variant Predominance – Eight U.S. Locations, December 2020-August 2021,* 70 Morbidity and Mortality Weekly Report (Aug. 27, 2021) available at https://www.cdc.gov/mmwr/volumes/70/wr/mm7034e4.com.

27.     Even more alarming, research focusing on the Pfizer vaccine's effectiveness in America shows that from December 14, 2020, until August 8, 2021, the vaccine plummeted in effectiveness, collapsing from 88 percent to 47 percent.[2]

28.     In addition, governmental authorities have revised their definition of the word "vaccine" itself in order to continue to label these experimental drugs with novel ingredients "vaccines" because they fail to meet the test of traditionally defined vaccines, which actually inoculated against infection and prevented transmission, neither of which these vaccines can any longer claim credit for – this reflects the fact there has never been a successful Covid-19 vaccine in history due to the viral evolution each virus mutates into.[3]

B.  The vaccine mandate ignores natural immunity.

29.     The National Institutes of Health and other bodies have found that natural immunity to Covid-19 – that is, immunity cause by infection with Covid-19 and recovery – is incredibly strong. Specifically, antibodies against the spike protein of the Covid-19 virus remain in 98% of people who have recovered from the virus six to eight months after infection (and the outer limit of the study was simply because the study was done on individuals where were six to eight months out of recovery, not because immunity begins to wear off).[4]

30.     Health and Human Services' Assistant Secretary, Dr. Admiral Brett

---

[2] Sara Y. Tartof, et al., *Six-month Effectiveness of BNT162b2mRNA COVID-19 Vaccine in a Large US Integrated Health System: A Retrospective Cohost Study,* Lancet, 2021 Oct. 16, 398 (10309):1407-16, available at https://pubmed.ncbi.nlm.nih.gov/34619098/.
[3] Katie Carrero, *Why did the CDC change its definition for 'vaccine'? Agency explains more as skeptics lurk,* MIAMI HERALD (Sept. 27, 2021) available at https://wwww.miamiherald.com/news/coronavirus/artcle254111268.html.

[4] NIH, *Lasting immunity found after recovery from COVID-19*, NIH (Jan. 26, 2021), available at https://www.nih.gov/news-events/nih-research-matters/lasting-immunity-found-after-recovery-covid-19.

Giroir stated in August 2021, in a nationally televised interview, that "there are still no data to suggest vaccine immunity is better than natural immunity. I think both are highly protective." [5]

31.     The data out of the State of Israel underscores this point. In a paper awaiting peer review, scientists out the State of Israel report that in studying thousands of patients, those whose only source of immunity was a vaccine (in the case of Israel, the Pfizer vaccine was used) had a 5.96 to 13.06-fold increased risk of a breakthrough infection with the Delta variant of Covid-19 over those whose immunity was natural.[6]

32.     Israel is one of the most vaccinated places in the world, with close to 80% of the country having been vaccinated. Israel's bout with the Delta variant of Covid-19 has demonstrated that the Pfizer vaccine, once considered the Cadillac of the three Covid-19 vaccines, is only 64% effective at preventing symptomatic cases of Covid-19.[7] Moreover, despite Israel's high vaccination rates, Israel is becoming "the world's COVID hotspot."[8]

33.     In addition, in a study concerning the Omicron variant, scientists found that the variant "can evade immunity from COVID-19 more so than any other previous variants discovered during the course of the pandemic."[9] "Researchers studied over 11,000 Danish

---

[5] FOX NEWS, *Admiral Brett Giroir explains natural immunity to COVID-19*, Admiral Brett Giroir (Aug. 13, 2021) available at https://www.youtube.com/watch?v=O641EW4okPs.

[6] Sivan Gazit, et al., *Comparing SARS-CoV-2 Natural Immunity to Vaccine -Induced Immunity: Reinfections Versus Breakthrough Infections*, medRvix (Aug. 25, 2021), available at https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf.

[7] Aaron Blake, *Vaccine doubters' strange fixation with Israel*, WASHINGTON POST (Jul. 22, 2021) available at https://www.washingtonpost.com/politics/2021/07/19/vaccine-skeptics-zero-israel-again-some-reasons/.

[8] Conor Boyd, *Israel is not the world's Covid hot spot: Cases sours despite country's trail blazing vaccine roll-out – sparking fears other highly-vaccinated countries will be hit by another wave due to jabs' waning immunity*, DAILY MAIL (Sept. 3, 2021) available at https://dailymail.co.uk/news/article-9951117/Isreal-worlds-covid-hotspot-0-2-population-catching-yesterday.html.

[9] Shirin Ali, New study finds omicron variant better at evading immunity, THE HILL (Jan. 3, 2021) available at https://thehill.com/changing-america/well-being/prevention-cures/588040-

households and found that those who had the Omicron variant had a 31 percent chance of a secondary attack rate (SAR), which refers to the probability an infection occurs within a specific group like a household or close contacts."[10] Moreover, the study revealed that "vaccine effectiveness was reduced to around 40 percent against symptoms and to 80 percent against severe disease. . ."[11]

34.    The now well-known study of the effects of natural immunity in the Cleveland Clinic Health System provides yet another example of the real-world superiority of natural immunity to vaccine immunity. That study compared "breakthrough infections" (re-infection after either contracting Covid-19 or taking a vaccine) among employees of the Cleveland Clinic Health System and found that those who were previously infected and unvaccinated, 1359 people, none suffered breakthrough infections. [12]

35.    Another published study found that there is "no discernible relationship between percentage of population fully vaccinated and new COVID-19 cases in the last [seven] days."[13] The study found to the contrary that there was a "marginally positive association such that countries with higher percentage of population fully vaccinated have higher Covid-19 cases per [one] million people." [14] That study, which analyzed 68 different countries' vaccination rates and the rate of new Covid-19 cases, specifically referred to Israel, Portugal and Iceland, each of

---

new-study-finds-omicron-variant-better-at citing and referencing
https://www.medrxiv.org/content/10.1101/2021.12.27.21268278v1.
[10] *Id.*
[11] *Id.*
[12] Nabin K. Shrestha, et al., *Necessity of COVID-19 Vaccine in Previously Infected Individuals*, medRxiv (Jun. 19, 2021), available at
https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v3.
[13] S.V. Subramanian and Aknil Kumar, Increases in COVID-19 are Unrelated to Levels of Vaccination Across 68 Countries and 2947 Counties in the United States, Eur J Epidemiol 2021 Sep 30:1-4, https://doi.org/10.1007/s10654-021-00808-7.
[14] *Id.*

which is highly vaccinated, and which had more cases per one million people than, for example, Vietnam and South Africa, which had around ten percent of their population fully vaccinated.[15]

36.    Several scholarly journals have also weighed in on the superiority of natural immunity to vaccine immunity. [16] Further, those who previously were infected with Covid-19 were at greater risk for bad side effects associated with the vaccine - in such cases, the vaccine might even weaken their pre-existing immunity.[17]

37.    While the vaccines have been effective at preventing serious cases and deaths, they lag far behind natural immunity in preventing symptomatic cases of Covid-19, and, therefore, transmission of Covid-19.

C.    The vaccine mandate relies on an improper assumption about the infection-fatality rate and asymptomatic spread.

38.    Covid-19 presents a risk primarily to individuals aged 85 or older[18] and those with comorbidities such as hypertension and diabetes.[19]

---

[15] *See id.*

[16] Jackson S. Turner, et al., *SARS-CoV-2 Infection Indicates Long-lived Bone Marrow Plasma Cells in Humans*, Nature, 595, 421-25 (May 24, 2021), available at https://www.nature.com/articles/s41586-021-03647-4.

[17] Carmen Camara, et al., *Differential Effects of the Second SARS-CoV-2 mRNA Vaccine Dose on T Cell Immunity in Naïve and COVID-19 Recovered Individuals*, bioRxiv (Mar. 22, 2021) https://doi.org/10.1101/2021.03.22.436441, available at https://www.biorxiv.org/content/10.1101/2021.03.22.436441v1.

[18] Mayo Clinic, *COVID-19: who's at higher risk of serious symptoms* (Jan. 22, 2022) available at: https://www.mayoclinic.org/diseases-conditions.

[19] Wren Hann, et al., *Comorbidities in SARS-CoV-2 Patients: a Systematic Review and Meta-Analysis*, ASM Journals/mBio/Vol.12, No. 1 (Feb.9, 2021) https://doi.org/10.1128/mBio.03647-20, available at  https://journals.asm.org/doi/10.1128/mbio.03647-20?permantly+true&.

39.     The majority of deaths associated with Covid-19 occur in those over the age of 55.[20] Within the most heavily impacted age group (age 85 and up), only 13.3% of deaths from February 2020 to February 2021 were attributed to Covid-19.[21]

40.     One of the most useful measures for calculating the risk of dying from a virus is the infection-fatality rate ("IFR"). The IFR is calculated by dividing the number of Covid-19 deaths by the number of Covid-19 infections. It attempts to answer the critical question: "If I get sick, what is the chance that I will die?" The Center for Disease Control and Prevention ("CDC") estimates the IFR for the bulk of most working-age adults is exceedingly low.[22] For adults under age 50, the CDC's "current-best estimate" is that 500 people will die per 1,000,000 infections nationwide.[23] In other words, for every one million adults infected age 50 or younger, 999,500 of them will survive Covid-19.[24]

41.     Assuming the data regarding Covid-19 infections is accurate, the CDC's numbers show Americans across the board are far more likely to die of something other than Covid-19, which casts considerable doubt on the Defendant's assertions that all employees should be vaccinated due to business necessity.[25]

---

[20] *Id.*
[21] Heritage Foundation, *COVID-19 Deaths by age* (Feb. 17, 2021) available at https://datavisualizations.heritage.org/public-health/covid-19-deaths-by-age/.
[22] CDC, *COVID-19 Pandemic Panning Scenarios,* Centers for Disease Control and Prevention (Mar. 19, 2021) available at https://www.cdc.gov/oronavirus/2019-ncov/hcp/planning-scenerios.html.
[23] *Id.*
[24] *Id.*
[25] Smiriti Mallapaty, *The Coronavirus Is Most Deadly If You Are Older and Male,* NATURE (Aug. 28, 2020) (demonstrating that individuals under 50 face a negligible threat of a severe medical outcome from a coronavirus infection, akin to the types of risk that most people take in everyday life, such as driving a car) available at https://www.nature.com/articles/d41586-020-02483-2.

42.     The Defendant already employs a very successful method of preventing Covid-19 spread from the symptomatic – self-quarantine. The Defendant's vaccine mandate only addresses one risk: asymptomatic lethal spread. The problem with the Defendant's mandate is two-fold: first, asymptomatic lethal spread is significantly less of a threat than the Defendant seems to assert,[26] and second, testing more effectively, and easily, suffices rather than forced injections of unwanted experimental, potentially life-altering drugs developed in ways that offend the Plaintiff's religious beliefs or discriminates against her because of her sincerely held religious beliefs.

43.     The Defendant uses the specter of "asymptomatic spread" – the notion that fundamentally healthy people could transmit Covid-19 to others without having any symptoms of Covid-19 – to justify its vaccine mandate. But there is little credible scientific evidence that demonstrates the phenomenon of "asymptomatic spread" poses any meaningful danger to employees or anyone else for that matter. Indeed, it is "very rare" even according to Anthony Fauci, and, at worst, poses a one-in-a-million risk of lethal spread. The Defendant's response to Covid-19 is predicated, in part, on the flawed assumption that asymptomatic individuals pose a meaningful risk of spreading disease.

44.     Evidence of transmission requires that an individual can be shown to be

---

[26] Michael A. Johansson, et al., *SARS-CoV-2 Transmission from People Without COVID-19 Symptoms,* JAMA Netw. Open, 2021; 4(1):e2035057 (Jan. 7, 2021) http://doi.10.1001/Jamanetworkopen.202.35057, available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707. *See also* Kenneth McIntosh, et al., *COVID-19: Epidemiology, Virology, and Prevention,* WoltersKluner (Jan. 13, 2022) available at https://www.uptodate.com/contents/covid-19-epidemiology-virology-and-prevention#H3392906512.

the source of infection for another person who then developed symptoms of a disease/illness.

45.     Basic microbiology shows that infectiousness or transmission of viruses such as Covid-19 require an active infection resulting in elevated levels of viral replication in the host and shedding of the virus.[27]

46.     Decades of research demonstrates that symptomatic people, such as those coughing, sneezing, and wheezing, are the real drivers of viral spread, a fact Dr. Anthony Fauci initially acknowledged during the early days of the pandemic when he told the press, "[E]ven if there is some asymptomatic transmission, in all the history of respiratory-born viruses of any type, asymptomatic transmission has never been the driver of outbreaks. The driver is always a symptomatic person." [28]

47.     When the viral replication process is blocked by a healthy immune system, the virus is neutralized, preventing significant viral replication and shedding. This occurs in approximately half the people exposed to the virus. Their immune system's defenses effectively ward off Covid-19 before it can take hold and cause symptomatic disease. Research demonstrated that asymptomatic people are not the drivers of Covid-19 transmission as demonstrated in the following points.

48.     Researchers studying real-world laboratory samples of more than a

---

[27] *See generally*, Samuel Baron, et al., *Medical Microbiology* (4th ed. 1996) available at: https://www.ncbi.nlm.nih.gov/books/NBK8149/. *See also* Hitoshi Kawasuji, et al., *Transmissibility of COVID-19 depends on the viral load around onset in adult and symptomatic patients*, PLOS ONE (Dec. 9, 2020) available at https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0243597.

[28] U.S. Department of Health and Human Services, *Update on the New Coronavirus Outbreak First Identified in Wuhan, China*, Press Briefing (Jan. 28, 2020) available at https://www.youtube.com/watch?v=w6koHkBCoNQ&t=2642s

quarter-million people found that even with a positive RT-PCR test, asymptomatic people have a much lower probability of being infectious.[29]

49. A research article published in the CDC's *Emerging Infectious Diseases* journal notes that little to no transmission of Covid-19 occurred from asymptomatic people studied by research in Germany.[30] The researchers note: "The fact that we did not detect any laboratory-confirmed SARS-CoV-2 transmission from asymptomatic case-patients is in line with multiple studies . . ."[31] The lack of scientific and medical evidence surrounding asymptomatic spread led the researchers to conclude that asymptomatic spread is "unlikely to substantially spread Covid-19.[32]

50. A review in March 2021 of all the published meta-analysis on asymptomatic transmission from Dr. John Lee, a retired British Professor of Pathology, reveals that in many cases, the same few studies have been recycled repeatedly to support the flawed proposition that those who are asymptomatic pose a real danger.[33] In the words of Allyson M. Pollock, a professor of public health at Newcastle University in the United Kingdom,

---

[29] Andreas Stang, *The performance of the SARS-CoV-2-RT-PCR test as a tool for detecting SARS-CoV-2 infection in the population* (Aug. 2021) 83 J. Infect. 2, https://doi:10.10161j.jinf.2021.05.022 available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8166461/.

[30] Jennifer K. Bender, *Analysis of Asymptomatic and Presymptomatic Transmission in SARS-CoV-2 Outbreak, Germany, 2020,* 27 Emerging Infectious Diseases 4 (April 2021) available at https://www.cdc.gov/cid/article/27/4/20-4576_article.

[31] *Id.*

[32] *Id.*

[33] *See* John Lee, *Asymptomatic spread: who can really spread COVID-19,* Health advisory & Recovery Team (Mar. 2021) available at https://www.hartgroup.org/wp-content/uploads/2021/03/ASYMPTOMATIC-SPREAD.pdf.

"[s]earching for people who are asymptomatic yet infectious is like searching for needles that appear and reappear transiently in haystacks, particularly when rates are falling."[34]

51.     Moreover, according to FDA, there is insufficient data to determine the vaccines authorized for emergency use actually prevent asymptomatic infection or the transmission of SARS-CoV-2, the virus that causes Covid-19.[35]

52.     Recently, the CDC reported that "new scientific data" demonstrated that vaccinated people who experienced breakthrough infections carried similar viral loads to the unvaccinated (but not naturally immune), leading the CDC to infer that vaccinated people transmit the virus at concerning levels.[36]

53.     The Defendants' vaccine mandate "accommodation" – limiting asymptomatic unvaccinated employees from its workplace by effectively terminating them – flies in the face of the current scientific literature, which shows asymptomatic spread of COVID-19 is virtually non-existent.

54.     In sum, little objective evidence exists to support a finding that asymptomatic spread is a driver of Covid-19 and, therefore, poses a danger to the Defendants' workplaces. Rather, the epidemic spread of Covid-19 is propelled almost exclusively by symptomatic persons (many of whom are fully vaccinated) who can easily self-isolate or quarantine from their co-workers.

---

[34] Allyson M. Pollock, *Asymptomatic transmission of covid-19,* the BMJ (Dec. 21, 2020) available at https://www.bmj.com/content/371/bmj.m4851.

[35] FDA, *Pfizer-BioNTech COVID-19 Vaccine Frequently Asked Questions,* (Nov. 19, 2020) available at https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/pfizer-biontech-covid-19-vaccine-frequently-asked-questions.

[36] *See CDC reversal on indoor masking prompts experts to ask, "Where's the data?",* WASHINGTON POST (Jul. 28, 2021) available at https://www.washingtonpost.com/health/breakthrough-infections-cdc-data/2021/07/28/dcaaa6b2-efce-11eb-a452-4da5fe48582d_story.html.

55.     A reasonable accommodation to vaccination is not to place perfectly healthy workers on unpaid status, and further to ban them from the workplace indefinitely or permanently. The Defendants' vaccine mandates are nonsensical, unjust, and a violation of federal and state law.

56.     The government-operated Vaccine Adverse Event Reporting System ("VAERS") database is intended to function as an "early warning" system for potential health risks caused by vaccines. For some time now, VAERS has been broadcasting a red alert. But the Defendant refused to take account this important data of adverse reactions to the vaccines and instead barreled down the tracks of forced vaccination at full steam.

57.     Recent data presents an alarming picture. As of November 18, 2022, there have been 32,370 deaths reported to VAERS from Covid-19 vaccines, compared to just 8,673 for the preceding 30 years for all other vaccines.[37] According to Josh Guetzhow, Ph.D., there are 91 times the number of deaths and 276 times the number of coagulopathy events reported after Covid-19 vaccination than after flu vaccination.[38]

58.     Moreover, new research suggests the heightened risk of adverse effects results from "preexisting immunity to SARS-CoV-2 [that] may trigger intense, albeit relatively rare, inflammatory and thrombotic reactions in previously immunized and predisposed individuals

59.      Although the number of VAERS reports is alarming in its own right, it is likely the true number of adverse effects associated with the Covid-19 vaccines far exceeds cases

---

[37] Josh Guetshow, *Safety Signals for COVID Vaccines are Loud and Clear. Why is Nobody Listening?* THE DEFENDER (Sept. 29, 2021) available at https://childrenshealthdefendse.org/defender/safety-signals-covid-vaccines-full-transparency-cdc-fda/.
[38] *Id.*

reported to VAERS. In 2010, a federal study commissioned by the U.S. Health and Human Services and performed by Harvard University consultants on behalf of the Agency for Health care Research and Quality ("AHRQ") found that "fewer than 1% of vaccine adverse events" are ever reported to VAERS.[39] Thus, it is likely scores of adverse events associated with the Covid-19 vaccines, including deaths, go unreported.

60. It is not just VAERS that is broadcasting a red alert. On October 1, 2021, the European Union's drug regulator, the European Medicines Agency ("EMA"), identified a new possible link between rare cases of blood clotting in deep veins with Johnson & Johnson's Covid-19 vaccine.[40] The EMA said the new, possibly life-threatening clotting condition known as venous thromboembolism ("VTE") should be included on the Johnson & Johnson product label as a possible side-effect of the shot.[41]

61. What is more, the Moderna and Pfizer vaccines are made with polyethylene glycol ("PEG") and Johnson & Johnson uses a similarly problematic ingredient: polysorbate.[42] PEG has been linked to anaphylaxis in numerous recipients of the vaccine. PEG is the delivery mechanism to the cells that keeps the mRNA from dispersing and not reaching its

---

[39] Ross Lazerus, et al. *Electronic Support for Public Health – Vaccine Adverse Event Reporting System (ESP:VAERS),* Agency for Healthcare Research and Quality (Sept. 30, 2010) available at https://digital.ahrq.gov./sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf.

[40] Reuters, EU finds J&J COVID shot possibly linked to another rare clotting condition, REUTERS (Oct. 1, 2021) available at https://www.reuters.com/business/healthcare-pharmaceuticals/eu-finds-jj-covid-shot-possibly-linked-another-rare-clotting-condition-2021-10-01/.

[41] *Id.*

[42] CDC, *COVID-19 Vaccines for People with Allergies* (Dec. 14, 2021) available at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/specific-groups/allergies.html.

intended target. PEG performs its intended use. Unfortunately, about 70% of the U.S. population is slightly to somewhat allergic to PEG. The National Institute of Health ("NHI") recently began a clinical trial of "systematic allergic reaction to the Moderna or Pfizer-BioNTech Covid-19 vaccines" due to the recipients of those vaccines experiencing anaphylaxis.[43]

62.     According to the CDC, individuals who are allergic to PEG should not take the Moderna or Pfizer vaccines, and those who are allergic to polysorbate should not take the Johnson & Johnson vaccine.[44]

63.     Despite this known risk, the Defendant is not offering PEG allergy testing pre-vaccination and are not offering any indemnity or disability coverage from any of the known and potential adverse effects of the Covid-19 vaccines.

64.     To summarize, the potential adverse effects Plaintiff faced in being coerced to receive the Covid-19 vaccines pursuant to the Defendant's vaccine mandate is not theoretical, hypothetical or academic – they are very real and have real victims. Given the alarming reports of adverse side-effects associated with the Covid-19 vaccines, subjecting Plaintiff to vaccination exposes them to a variety of health risks ranging from headaches and blood clots to death.

**The Defendant improperly refused to grant the Plaintiff's religious exemption in violation of Title VII and O.R.C. § 4112.12**

A.  <u>The Defendant's improper conduct regarding the vaccine mandate policy and procedures and its communications with the Plaintiff regarding her request for a religious exemption.</u>

---

[43] NIH, *NIH begins study of allergic reactions to Moderna, Pfizer-BioNTech COVID-19 vaccines* (Apr. 7, 2021) available at https://www.nih.gov/news-events/news-releases/nih-begins-study-allergic-reactions-moderna-pfizer-biontech-covid-19-vaccines.
[44] *See id.* at note 43.

65.     On October 7, 2021 the Defendant updated its vaccination policy and stated that it would require, as a condition of employment, all employees to receive a Covid-19 vaccination. *See* **Exhibit A.**

66.     The Defendant gives the illusory presentation that religious exemptions would be properly considered. However, the Defendant never adhered to their duty to protect religious rights as guaranteed by the constitution and Title VII.

67.     On or about October 15, 2021 the Plaintiff delivered her exemption request for the Covid-19 vaccine. It is important to note that the Defendant did not provide a form for her to follow or document any requirements she must follow in order to submit a request. *See* **Exhibit C**

68.     Ms. Wellman's religious rights, as the EEOC defines sincerely held religious beliefs, are very broad. The EEOC in their on-line guidance document titled: *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* ("*EEOC COVID-19 Guidance")*, states:

> [T]he definition of religion is broad and protects beliefs, practices, and observances with which the employer may be unfamiliar. Therefore, the employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief, practice, or observance. However, if an employee requests a religious accommodation, and an employer is aware of facts that provide an objective basis for questioning either the religious nature or the sincerity of a particular belief, practice, or observance, the employer would be justified in requesting additional supporting information.
> *See* EEOC COVID-19 Guidance K.12

69.     Three days later, on October 18, 2021 Ms. Wellman was informed, via letter, that her religious exemption request had been denied. In the denial Defendant stated: "Please be advised that the health district is not making a determination regarding

your religious belief and whether or not it is sincerely held at this time. We reserve the right to do so at a later date…" *See* **Exhibit D**

70.     On January 7, 2022, the Defendant provided additional proof that Ms. Wellman's religious beliefs were not properly considered when the Defendant terminated Ms. Wellman. The letter states: "we must prevent the spread of COVID-19 and protect our Green County residents and employees by controlling COVID-19 through compliance with the vaccine mandate. The health district must stand by our original determination that the unvaccinated provide a "direct threat" to themselves and others and has determined there is no reasonable accommodation that can be provided that would minimize the threat of spread or exposure to COVID-19 while performing your job duties at the health district." (Attached hereto as **Exhibit E**)

71.     The above statement fails both according to science, law, and logic.

72.     On August 8, 2021 head of the CDC, Rochelle Walensky, admitted on live television that the Covid-19 vaccines do not stop transmission. When addressing that issue specifically she stated: "...what they [the Covid-19 vaccines] can't do anymore is prevent transmission" [45] A look at the article today shows no updates, no withdrawals of the statement, and no corrections.  Nobody paying attention today would claim that the Covid-19 vaccines stop people from getting or transmitting disease. But even before Ms. Wellman was denied her religious exemption request, and well before she was terminated, this information was available for the Defendant who knew, or should have known, that their support for terminating Ms. Wellman was unsupported by science.

---

[45] https://edition.cnn.com/us/live-news/coronavirus-pandemic-vaccine-updates-08-06-21/h_61de1502e86060f5faf4477339928e33

73.     The decision fails legally from multiple perspectives. The first is that her religious exemption request, which is governed by Title VII, was evaluated via a "direct threat" analysis. While Ms. Walensky's statement above goes to show that the Defendant's conclusion of Ms. Wellman being a direct threat because of her vaccination status is unsupportable, it was the wrong analysis to begin with.

74.     The EEOC guidelines, Title VII, and case law provide clear requirements that a religious exemption request be evaluated very differently than the direct threat analysis that is used in an ADA case and by the Defendant.

75.     This discrepancy in requirements puts the Defendant at odds with federal and state law. Thereby making the Defendant's decision to deny Ms. Wellman's religious exemption request illegal.

76.     The clearest statement that proves the Defendant's actions were in violation of Federal Law is the unambiguous statement from the EEOC guidelines from section K.12 where it states:

> Once an employer is on notice that an employee's sincerely held religious belief, practice, or observance prevents the employee from getting a COVID-19 vaccine, the employer **must** provide a reasonable accommodation unless it would pose an undue hardship." (emphasis added)

EEOC guidance explains that the definition of religion is broad and protects:

> beliefs, practices, and observances with which the employer may be unfamiliar. Therefore, the employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief, practice, or observance.

77.     The Defendant failed to meet the above requirements in their declaration that Ms. Wellman's religious exemption request failed to meet an unsupported and significantly different threshold of "direct threat" than what is defined in federal law and guidelines.  They did this

21

willfully while trampling the rights guaranteed under Title VII and specifically documented in

the EEOC guidelines that are particular to religious exemptions and the Covid-19 vaccine

78.     Upon information and belief, the Defendant never planned to follow

federal or state law requirements, discussed *infra*, that reasonable accommodations must be made

for the religious observances of its employees, short of undue hardship. The Defendant's

correspondents (*See* **Exhibits D&E**) with Ms. Wellman clearly states this in denying Ms.

Wellman's religious exemption request as they did with 100% of all the other religious

exemption requests that the Defendant received.

79.     Upon information and belief, the Defendant denied all requests for

religious accommodations.


B. Federal law and State law prohibiting religious discrimination.

80.      Title VII prohibits the Defendant from discriminating against employees based on

their religion. This "include[s] all aspects of religious observance and practice, as well as belief,

unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . .

religious observance or practice without undue hardship on the conduct of the employer's

business." 42 U.S.C. § 2000e(j).

81.     Title VII "imposes upon employers a 'statutory obligation to make

reasonable accommodation for the religious observances of its employees, short of undue

hardship." *Reed v. International Union, United Automobile, Aerospace and Agricultural

Implement w\Workers of America*, 569 F.3d 576, 579 (6th Cir. 2009).

82.     A prima facie case of religious discrimination based on a failure to

accommodate requires a plaintiff to show "(1) a bona fide religious practice conflicts with an employment requirement, (2) he or she brought the practice to the [defendant's] attention, and (3) the religious practice was the basis for the adverse employment decision." *E.E.O.C. v. Union Independiente de la Autoridad de Acuductos y Alcantarillados de Puerto Rica*, 279 F.3d 49, 55 (1st Cir. 2002). *See also Reed,* 569 F. 3d at 579 (6th Cir. 2009); *Smith v. Pyro Mining Co.,* 827 F.2d 1081 (6th Cir. 1987) A "bona fide religious practice" or belief is one that is "religious and sincerely held." *Id.* Title VII's definition of religion includes "all aspects of religious observance and practice, as well as belief." *Id.,* citing 42 U.S.C. § 2000e(j). Further 29 C.F.R. § 1605.1 states that religious practices include "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious values." Section 2000e(j) "leaves little room for a party to challenge the religious nature of an employee's professed beliefs." *Union Independiente*. Religious beliefs are not required to be "acceptable, logical, consistent, or comprehensible to others," and that interfaith differences as to what is scripturally acceptable are "not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences." *Id.*

83.     Ms. Wellman carried each of these elements as outlined throughout this complaint. Specifically:

       a.  Her religious practice of not putting anything into her body that in part came from aborted fetal cells conflicted with Defendant vaccine policy,

       b.  Ms. Wellman put Defendant on notice via her submitted form. *See* **Exhibit C**; and

      c.   The Defendant's failure to consider her sincerely held religious beliefs, and how they conflict with the Defendant's policies, resulted in Ms. Wellman's termination.

84.    Once an employee has made out a prima facie case of discrimination, the employer must show that it offered a reasonable accommodation, or that reasonable accommodation would be an undue burden. *Stanley v. Lawson Co.,* 993 F. Supp. 1084 (N.D. Ohio 1997).

85.    "An employer must . . . present evidence of undue hardship" and not "rely merely on speculation," *Smith v. Pyro Min. Co.,* 827 F.2d 1081, 1085-86 (6th Cir. 1987), and the lack of substantive content in the Defendant's justification here demonstrates that the Defendant cannot show undue hardship.

86.    Merely stating that there is increased risk to the workplace and employee safety without explaining why and without providing evidentiary support cannot be sufficient to meet the Defendant's obligation under Title VII to establish undue hardship. Establishing "undue hardship" requires assessment of actual circumstances at the employer's place of business and of proposed and potential accommodations, and the Defendant's rote justification demonstrates that the Defendant did not do the work of assessing undue hardship. *See* **Exhibits D&E**.

87.    The justification that the Defendant used to deny Ms. Wellman's religious exemption is the exact hypothetical and speculative burdens case law specifically forbids to be used to deny someone's religious rights.

88.     As outlined above, at the time of Ms. Wellman's denial and termination there was no proof that the vaccines stopped transmission and in fact the leaders of our health organization said as much.

89.     Furthermore, the Defendant fraudulently claimed, with zero evidentiary support, that by providing Ms. Wellman her religious exemption could somehow put their federal funding at risk. *See* **Exhibit E**.

90.     Ms. Wellman's specific department was run and funded by the Ohio Women, Infants, and Children Program (WIC). WIC provided the Defendant with guidance no later than November 4, 2021 via email stating that "the Ohio WIC Program does NOT mandate the COVID-19 vaccine in order to work for or in a WIC clinic." (emphasis in original) (attached hereto as **Exhibit F**)

91.     There is absolutely no proof that federally funded programs had their funding placed at risk if employees had their religious rights properly considered and granted when appropriate.

92.     Every federal rule/guidance that was created whether it was for federal workers, contractors, recipients of Medicare/Medicaid funding or any other federal revenue stream, always allowed for the granting of religious exemptions to the vaccine.

93.     Ms. Wellman's termination letter dated 1/7/22 concludes that "We are also subject to the workplace protocols for federal contractors since we share a building with Five Rivers Greene County Health Center and as such, all employees that share the workspace must be vaccinated." *See* **Exhibit E**.

94.     This is either another fraudulent claim of what the requirements for federal contractors are, or a fatal misunderstanding of the guideline that has now been withdrawn by the Biden Administration.

95.     The federal contractor vaccine mandate was halted and under numerous court challenges from virtually the moment it was announced.[46]

96.     The federal contractor vaccine mandate was established via Executive Order 14042 and is subject to federal law.[47] As documented throughout this complaint, federal law requires Ms. Wellman's religious rights to be properly considered.

97.     Ms. Wellman's right to have her religious exemption properly considered arises out of the First Amendment to the Constitution and to Title VII of the Civil Rights Act of 1964. There is no precedent in American law that allows for such an executive order to supersede federal law, let alone the constitution.

98.     Today we are even seeing courts require service men and women to have their religious exemptions individually considered.[48]

99.     The grounds on which the denial of Ms. Wellman's religious rights were purposefully trampled are the exact grounds federal and state laws explicitly forbid.

100.    The Defendant never conducted an undue hardship analysis, and therefore should not be allowed retroactively. However, if such analysis were allowed to be conducted after-the-fact, it would necessarily fail to justify Ms. Wellman's denial.

---

[46] https://www.natlawreview.com/article/task-force-and-omb-issue-new-guidance-federal-contractor-vaccine-mandate
[47] https://www.presidency.ucsb.edu/documents/executive-order-14042-ensuring-adequate-covid-safety-protocols-for-federal-contractors
[48] https://lc.org/newsroom/details/081922-us-marines-win-class-protection-from-shot-mandate

101.     Undue hardship analysis must start with an analysis of proposed accommodations. The Defendant did not identify potential accommodations. Therefore, the Defendant did not reach the first step of analyzing accommodations.

102.     An employer violates Title VII if it fails to attempt as accommodation after accommodation is requested. *EEOC v. Arlington Transit Mix, Inc.,* 957 F.2d 219, 222 (6th Cir. 1991) ("[a]fter failing to pursue [a voluntary waiver of seniority rights] or any other reasonable accommodation, the company is in no position to argue that is was unable to accommodate reasonably [plaintiff's] religious needs without undue hardship."); *EEOC v. Ithaca Indus., Inc.,* 849 F.2d 116 (4th Cir. 1988) *cert denied* 488 U.S. 924 (1988) (same).

103.     An employer must demonstrate attempted accommodation before it claims undue hardship as a defense. *See, e.g., Redmond v. GAF Corp.,* 574 F.2d 897, 901-02 (7th Cir. 1978); *Shaffeld v. Northrop Worldwide Aircraft Serv., Inc.,* 373 F. Supp. 937, 944 (M.D. Ala. 1974). The Defendant's' justification for denying the Plaintiff's requests for religious exemptions demonstrates that it did not consider potential accommodations.

104.     Moreover, the Defendant clearly could have considered accommodations as dictated by the EEOC. In the EEOC COVID-19 Guidance, the guidelines provide "examples of reasonable accommodations or modifications that employers may have to provide to employees who do not get vaccinated due to disability; religious beliefs, practices, or observance; or pregnancy." Reasonable accommodations the EEOC has identified as potentially not imposing an undue hardship on the employer include requiring the unvaccinated employee entering the workplace to:

(1) wear a face mask,

(2) work at a social distance,

(3) work a modified shift.

(4) get periodic tests for COVID-19,

(5) be given the opportunity to telework, or

(6) accept a reassignment.

*See* EEOC COVID-19 Guidance*,* K.2. The Plaintiff would have willingly complied with any of these accommodations.

105.    Beginning in March 2020, the Defendant had the opportunity to test many relevant accommodations for its employees, including daily assessments of personal health and potential exposure, availability of targeted COVID-19 testing, protocols requiring non-work when symptomatic or potentially exposed to COVID-19, contact tracing, handwashing and hygiene, and the use of PPE.

106.    Such accommodations are understood to have prevented any substantial or material transmission of COVID-19 when used.

107.    In addition, other accommodations are potentially available. For instance, the EEOC has specifically identified testing of employees before they enter the workplace. The *EEOC COVID-19 Guidance* states, "an employer may choose to administer COVID-19 testing to employees before initially permitting them to enter the workplace." *EEOC COVID-19 Guidance*, A.6.

108.    The Defendant's vaccine mandate provided employees the illusory ability to obtain a religious exemption from the vaccine mandate.

109.    The Defendant terminated the Plaintiff for "insubordination," and "Failure to comply with the Greene County Public Health COVID-19 Prevention policy." *See* **Exhibit E**

110. The October 18, 2021 denial specifically states that the Defendant did not "make a determination regarding your religious belief and whether or not it is sincerely held." But that the Defendant may make such determinations in the future. *See* **Exhibit E**.

111. The January 7 2022, termination letter makes no references to Ms. Wellman's religious beliefs and/or the sincerity of them. As a result we are left to conclude that the statement of October 18 remains the Defendant's position. Ms. Wellman's religious beliefs were illegally ignored when denying her accommodation request.

112. The Defendant made no attempt to accommodate the Plaintiff's request for religious exemption, despite the fact that she was willing to comply with other safety precautions.

113. The Defendant did not engage the Plaintiff in a give and take discussion about potential accommodations. Plaintiff's willingness to comply with other safety measures were ignored.

114. The Defendant's claim of Ms. Wellman being a direct threat to others as an unvaccinated person also fails logically taken on the whole.

115. The Defendant was placed on notice October 15, 2021, that Ms. Wellman was unvaccinated and that she had a sincerely held religious belief that precluded her from getting the Covid-19 vaccine. Her exemption request was denied on October 18, 2021, and she was terminated on January 7, 2022.

116. Ms. Wellman made it perfectly clear on numerous occasions that she was not going to take the vaccine yet her employer allowed her to work for almost 60 days while unvaccinated. If Ms. Wellman was a "direct threat" to herself, and the vulnerable individuals she

29

worked with via the Ohio WIC program, she should have not been allowed to work another second passed the time the Defendant knew she was not going to get vaccinated.

117.    Defendant's own actions in allowing Ms. Wellman to work from mid-October 2021 to January 7, 2022 proves beyond any doubt that the Defendant knew she was not a "direct threat." Otherwise, if she were a known "direct threat" the Defendant's actions would have been much different.

118.    At the time of Ms. Wellman's termination, patients were not being seen directly in the clinic. Upon information and belief, it is still the case that patients at the WIC clinic are not being seen face-to-face because of the Covid restrictions that were in place at the time of Ms. Wellman's termination.

119.    By each and every legal standard, including the very one the Defendant used to justify Ms. Wellman's exemption denial, the Defendant either failed their legal duties and/or failed to act as if Ms. Wellman presented an actual direct threat to anyone.

120.    It is well established that Title VII and O.R.C. § 4112 "have the same evidentiary standards and general analysis." *Gibbons v. Bair Foundation,* No. 1:04CV2018, 2007 WL 582314, at *4-5 (N.D. Ohio Feb. 20, 2007) citing *Greene v. St. Elizabeth Hosp. Med. Ctr.,* 134 F.3d 371, 1998 WL 13410, at *5 (6th Cir. 1998).

121.    Given these facts, the Defendant's vaccination policy is vastly overreaching and unnecessarily violated federal and state law.

## COUNTS

### COUNT ONE

**Violation of Title VII, 42 U.S.C. § 2000e, *et seq.***
**Religious Discrimination-Failure to Accommodate**

30

122.     Plaintiff restates the foregoing paragraphs as if set forth fully herein.

123.     At all times relevant, Plaintiff was Defendant's "employee" within the meaning of 42 U.S.C. § 2000e(f).

124.     At all times relevant, the Defendant was Plaintiff's "employer" within the meaning of 42 U.S.C. § 2000e(b).

125.     Plaintiff holds sincere religious beliefs that preclude her from receiving a COVID-19 vaccine.

126.     Plaintiff informed her employer, the Defendant, of those beliefs and requested religious accommodations from the Defendant's vaccine mandate.

127.     The Defendant refused to engage in a meaningful interactive process with the Plaintiff regarding her religious accommodation request and instead only responded to Plaintiff with an unsupported conclusion and legal analysis that was inapplicable with the Title VII issue at hand. The Defendant failed to consider the Plaintiff's religious exemption request and investigate it under the undue burden analysis required by law. They instead terminated her without the legal justification required to do so where the Defendant was on notice of a Title VII religious accommodation request.

128.     Had the Defendant conducted a proper undue burden analysis it would have been clear the law would have required Ms. Wellman's exemption request to be granted.

129.     The Defendant thereby discriminated again the Plaintiff because of her religious beliefs.

130.     By failing to engage in the interactive process, or offer any reasonable accommodation, the Defendant's discriminatory actions were intentional and/or reckless and in violation of Title VII.

131.     It is reasonable to infer from the totality of the circumstances that Defendant did not bother engaging in an interactive process with those seeking religious exemptions because the Defendant intended to discriminate against those seeking religious exemptions and never intended to provide them with a reasonable accommodation.

132.     In multiple an unemployment hearings, while under oath, Melissa Howell, employee/agent of the Defendant, admitted that 100% of the religious exemption requests were denied.

133.     The Defendant illegally and improperly did not identify potential accommodations as required by state and Federal law. The Defendant cannot assert the defense of undue hardship because it did not assert or show undue hardship in declining to accommodate the Plaintiff's sincerely held religious beliefs and no undue burden exists here regardless.

134.     By discriminating against Plaintiff, because of her sincerely held religious beliefs, in their decision to deny Plaintiff's legitimate religious exemption, the Defendant violated Title VII. And this violation has harmed and continues to harm Plaintiff.

135.     Due to the Defendant's improper and willful, intentional and unlawful actions and the subsequent harm suffered by the Plaintiff, the Plaintiff asks the Court for the relief requested in her Prayer for Relief.

## COUNT TWO

### Violation of O.R.C. § 4112, *et seq.,*
### Religious Discrimination-Failure to Accommodate

136.     Plaintiff restates the foregoing paragraphs as if set forth fully herein.

137.     Plaintiff holds sincere religious beliefs that preclude her from receiving a COVID-19 vaccine.

138.     Plaintiff informed her employer, the Defendant, of those beliefs and

requested religious accommodations from the Defendant's vaccine mandate.

139. The Defendant refused to engage in a meaningful interactive process with the Plaintiff regarding her religious accommodation request and instead only responded to Plaintiff with an unsupported conclusion and legal analysis that was inapplicable with the religious accommodation issue at hand. The Defendant failed to consider the Plaintiff's religious exemption request and investigate it under the undue burden analysis required by law. They instead terminated her without the legal justification required to do so where the Defendant was on notice of a religious accommodation request.

140. The Defendant thereby discriminated again the Plaintiff because of her religious beliefs.

141. By failing to engage in the interactive processor offer any reasonable accommodation, the Defendant's discriminatory actions were intentional and/or reckless and in violation of O.R.C. § 4112, *et seq.*

142. It is reasonable to infer from the totality of the circumstances that Defendant did not bother engaging in an interactive process with those seeking religious exemptions because the Defendant intended to discriminate against those seeking religious exemptions and never intended to provide them with a reasonable accommodation.

143. The Defendant illegally and improperly did not identify potential accommodations as required by state and Federal law. The Defendant cannot assert the defense of undue hardship because it did not assert or show undue hardship in declining to accommodate the Plaintiff's sincerely held religious beliefs and no undue burden exists here regardless.

144. By discriminating against Plaintiff, because of her sincerely held

religious beliefs, in their decision to deny Plaintiff's legitimate religious exemption, the

Defendant violated O.R.C. § 4112, *et seq.* And this violation has harmed and continues to harm

Plaintiff.

145.     Due to the Defendant's improper and willful, intentional and unlawful

Actions, conducted with malice and aggregated and egregious fraud, and the subsequent harm

suffered by the Plaintiff, the Plaintiff asks the Court for the relief requested in her Prayer for

Relief.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the

following relief:

A. Payment for all economic damages, including, but not limited to, back pay, front pay
   and benefit in amounts to be determined at trial;

B. Compensatory and consequential damages, and all non-economic damages, including
   for emotional duress;

C. Punitive damages;

D. Statutory damages;

E. Pre-judgment and post-judgment interest at the highest lawful rate;

F. An award of reasonable attorneys' fees, costs and expenses of all litigation to the
   extent allowable under federal and state law;

G. Trial by jury on all triable issues; and

H. Such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

*/s/Glenn Feagan*
Glenn Feagan (Bar No. 041520)
Deters Law
5247 Madison Pike
Independence, KY 41051
Phone. (859) 363-1900
gfeagan@feaganlaw.com